UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BYRON JONES, as Personal
Representative of the Estate of
SHARLEEN "SALLY" JONES,

        Plaintiff,

v.                                CASE No. 8:04-CV-1169-T-23TGW

BOB WHITE, et. al.,

        Defendants.

_____

## REPORT AND RECOMMENDATION

        This case arises from the fatal shooting of Sharleen "Sally" Jones by Pasco County deputy sheriff Erica Fernandez who was following up a report that Jones had threatened suicide.  Fernandez testified that she shot Jones as Jones was raising a gun at her.  The plaintiff claims, however, that Jones was unarmed.  Not only is there no significant probative evidence to support this theory, but it makes no sense to think that Fernandez, who had never before even pointed a gun at a suspect, would shoot an unarmed woman during a welfare check.  Consequently, I recommend that Fernandez be

granted summary judgment on count I, which is premised on the theory that Jones was unarmed.

Furthermore, I recommend that summary judgment be granted on count II, which alleges that Fernandez and deputy sheriff Barry Arnew conspired to plant a gun near Jones and to lie about the events. There is no significant probative evidence supporting such a conspiracy.

I.

The plaintiff, Byron Jones, is the husband of the deceased Sharleen Jones, who was known as Sally. The current defendants in this case are Erica Fernandez and Barry Arnew, who were both deputies with the Pasco County Sheriff's office on the day of the shooting.[1]

In the morning of May 22, 2002, Byron Jones and Sally Jones went to the Tampa Tribune office to place a classified ad for the sale of their jewelry store because they were planning to move to American Samoa. Later that morning, they went to their Pasco County store, which was named Dan's

---

[1]Deputy Erica Fernandez is now known as Erica Hernandez Morera (Fernandez dep., p. 4). For clarity of reference, she will be referred to as Fernandez. Fernandez retired from the Sheriff's office on January 28, 2005, due to an in-the-line-of-duty disability (id. at p. 9).

Fine Jewelry, to open up for business (Jones dep., p. 140; Doc. 21, p. 6, ¶24).[2]

 Thereafter, a family member called the store to inform the Joneses that there were police cars in front of their home (Jones dep., pp. 141, 145).  Wondering why the deputies were there, Byron Jones decided to go home and find out (id. at p. 141).  The Joneses' home was only about a mile and a half from the store (id. at p. 142).  Before leaving, Byron Jones informed his wife that he had left his gun in a back room on his work bench (id. at p. 145).[3]  The gun was loaded and in its holster (id. at p. 148).  When he left, Sally Jones locked the store, so that she would have to hit a buzzer to let people in.

     The previous evening, an e-mail was sent from Sally Jones's computer to the inspector general's office of the railroad retirement board, indicating that she was suicidal (Doc. 21, p. 8, ¶¶ 36, 37).  The e-mail stated that "[b]y the time you receive this letter, I will be dead" (Doc. 48-1, pp. 5-6).[4]

---

[2]Originally, Byron Jones operated Dan's Fine Jewelry with his brother Dan Jones (Jones dep., pp. 11-12).  However, as subsequently explained, the relationship soured after Dan Jones concluded that Sally Jones had reported him for improperly receiving a disability pension.  The partnership ended and Byron Jones remained as the owner of the store (id. at  pp. 15-16).

[3]Byron Jones kept a gun at the store due to the nature of the business (Jones dep., p. 142).

[4]According to the plaintiff, the e-mail was sent on May 21, 2002, at 9:35 p.m. before he and his wife arrived home from church (Doc. 48-1, p. 6).  The plaintiff asserts that, while they were gone, some family member entered the computer, doctored a draft, and sent the e-mail containing a suicide threat (Jones dep., pp. 78-84).  The plaintiff has

Light may be shed on the e-mail by a family disagreement involving Byron Jones's brother Dan Jones.  Dan Jones was receiving disability checks due to his prior employment with a railroad (Jones dep., p. 87).  Someone notified the United States Railroad Retirement Board that, although Dan Jones was receiving disability checks, he was working at the jewelry store.  Dan Jones told Byron Jones that he was informed that it was Sally Jones that had turned him in (id. at pp. 88, 89).  However, Byron Jones testified that he does not believe that Sally Jones was the one that originally notified the retirement board (id. at pp. 94-95), although he alleges in his complaint that she did (Doc. 21, p. 7, ¶30).  Moreover, Fernandez testified to statements that Sally Jones made to her that would support the conclusion that it was Sally Jones who reported Dan Jones (Fernandez dep., p. 74).  Regardless of whether she did or not, the belief that she did created family tensions and ended the business relationship (Jones dep., pp. 103-08).

As a result of the e-mail, the next day the railroad retirement board contacted the Zephyrhills police department.  That agency determined,

---

not adduced any probative evidence to support this suspicion.

however, that the Pasco County Sheriff's office had jurisdiction and transferred the matter there (Fernandez dep., p. 53).

After being dispatched on the suicide threat, Fernandez, along with Arnew, arrived in their separate vehicles at the Joneses' home (id. at p. 32). It was 11:23 in the morning (id. at pp. 39, 41). After determining that no one was home, they left the residence at 11:38 a.m. (id. at pp. 43, 44). While driving down the street, Fernandez was flagged down by Dan Jones because he saw the deputies at the Joneses' home (id. at p. 44). Dan Jones informed Fernandez that Sally Jones may be at the jewelry store (Fernandez statement, p. 7).

Thereafter, Fernandez proceeded, by herself, to Dan's Fine Jewelry and arrived in the parking lot at 11:41 a.m. (Fernandez dep., pp. 45, 46). Sally Jones buzzed Fernandez into the store at about 11:43 a.m. (id. at p. 61).

Fernandez has given two statements under oath concerning the events that took place in the jewelry store. One was made the day following the shooting, and the other was a deposition taken about three years later. The following is a synopsis of those statements.

Fernandez stated that, when she entered the store, she asked if a Sharleen Jones was there, whereupon Jones identified herself (id. at p. 67). Jones was standing toward the back of the store by a display case near the cash register (id. at pp. 63, 65). Fernandez asked if anyone else was present in the store, because she did not know whether Jones would want to talk about her feelings in the presence of others (id. at p. 68). Jones informed Fernandez that they were alone (id.).

Fernandez then asked Jones if she knew why she was there, and Jones responded that she did and became very agitated (id.). Jones claimed that she was a federal witness and that Fernandez had given up her identity (id. at p. 69). Jones was very agitated about her identity being revealed since the person now knew who she was (id. at p. 71). At this point, Fernandez thought that Jones was borderline mentally unstable, but did not know for sure (id. at p. 70). Fernandez explained to Jones that she did not work for the federal government, but instead worked for the Pasco County Sheriff's office (id. at  p. 72). Jones responded that she knew who Fernandez was (id.).

Fernandez asked Jones about the e-mail and whether she wanted to harm herself (id. at p. 73). Jones responded that she did not think they would get the e-mail so quickly (id. at p. 74). Jones stated she was going to

kill herself the day before but did not do so because she thought her husband was having a heart attack (although he did not have one) and he had to go the hospital (id.).  At this point, Fernandez determined that Jones had written the e-mail and made the suicide threat (id.).  Fernandez then asked Jones if she could do it now, meaning commit suicide.  Jones responded, "Now I could do it" (id. at p. 75).  Fernandez made the determination that she could proceed with a Baker Act commitment (id.).  She, therefore, attempted to establish rapport with Jones as Jones was a big woman (and Fernandez was smaller in stature) (id. at pp. 8, 75, 76).

Fernandez approached Jones and put her hands on the jewelry display counter (id. at p. 83).  Fernandez asked Jones if she would accompany her to a place where Jones could talk about her feelings (id. at pp. 83, 84). Jones replied "no" in a very agitated voice and backed up (id. at pp. 84, 86). When Jones backed up, Fernandez noticed a gun in her right hand (id. at p. 87).  At that point, Fernandez drew her weapon on Jones and took a step back (id.).  Fernandez believes she kept her finger outside the trigger guard until she decided to shoot (id. at p. 92).

Jones raised her left hand to hit a switch and Fernandez thought that she was locked in the store with no option to retreat (id. at pp. 78, 87, 93).

Fernandez asked Jones what she was going to do with the gun, and Jones responded, "I don't know" (id. at p. 92). During this time, Fernandez kept eye contact with Jones. Jones then broke eye contact with her, which Fernandez later realized occurred because Byron Jones had arrived at the store (id. at p. 98) and Jones must have seen her husband. Sally Jones, holding the gun, raised the gun and Fernandez decided to shoot her when the gun had reached about a forty-five degree angle (id. at pp. 107-110). Sally Jones then said, "I wasn't going to" (id. at p. 112). Fernandez remembers stepping back as she fired, but does not remember pulling the trigger four times, although four shots were fired (id. at p. 114). Fernandez states that she was in fear for her life when Jones raised the gun (Fernandez statement, p. 37). After the shots were fired, Jones fell to the ground on her side (Fernandez dep., p. 120). Fernandez then called for back-up at 11:47 a.m. (id. at p. 129; Plt. Ex. E).

Fernandez went to Jones with her gun still drawn in order to secure Jones's gun (Fernandez dep., pp. 119, 121). Fernandez turned Jones face up in an effort to find the gun, but she could not find it (id. at p. 121). Fernandez then applied pressure to Jones's chest to try to stop the bleeding (id. at p. 124).

Arnew arrived, but Fernandez did not know how to unlock the door (id. at p. 132).  Fernandez looked around and hit the buzzer to let him in (id. at p. 133).  Fernandez was hysterical and continually said, "She's going to die" (id. at p. 135; Fernandez statement, p. 18).  Other police officers arrived, followed by the emergency medical service ("EMS").

Fernandez then found the gun located on the counter with its grip in the air (Fernandez dep., p. 138).  She attempted to secure the gun by putting it in her belt, but, when it would not fit, Arnew told her to leave it on the counter (id. at pp. 137, 138).  Arnew told Fernandez to go clean up in the back room because she had blood on her hands (id. at p. 137).

In the meantime, Byron Jones had gone to his home, discovered no one was there, and returned to the jewelry store (Jones dep., p. 149).  When he arrived in the parking lot, he parked next to Fernandez's car and headed toward the front door (id. at p. 150).  He heard gun shots before he reached the sidewalk in front of the store (id.).  He went to the door and tried to get in, but the door was locked (id. at pp. 151-52).  From his position at the door, he saw his wife fall (id. at pp. 152, 153).  He did not see his wife holding a gun or see a gun around her (Plt. Ex. C, ¶19).  He did see a Gatorade bottle on the floor (Jones statement, pp. 9, 11, 18).

EMS arrived at the scene at 11:54 a.m. and started treatment the next minute (Plt. Ex. E).  EMS left the scene for the hospital at 12:12 p.m. and arrived there at 12:16 p.m. (id.).  Sally Jones died shortly thereafter.

On May 20, 2004, Byron Jones, as personal representative of the Estate of Sally Jones, filed a three-count complaint against Bob White, the Sheriff of Pasco County, and deputies Erica Fernandez and Barry Arnew (Doc. 1).  On August 6, 2004, Jones filed a second amended complaint (Doc. 21).  He alleges in count I that Fernandez unjustifiably shot an unarmed Sally Jones, and in count II that Fernandez and Arnew planted Jones's gun to make the shooting appear justified.  Count III of the complaint alleges that Sheriff White violated Sally Jones's civil rights.

Subsequently, Sheriff White filed a motion for summary judgment (Doc. 32).  The plaintiff agreed that Sheriff White's motion should be granted (Doc. 45).  Consequently, judgment was entered in favor of Sheriff White, and he was dismissed from the case (Docs. 46, 47).

Fernandez and Arnew also filed a motion for summary judgment, arguing that there was no constitutional violation, or, alternatively, that they are entitled to qualified immunity on the plaintiff's claims of use of excessive force and conspiracy to cover-up the shooting (Doc.  34).  That motion has

been referred to me for a report and recommendation (Doc. 46).  After the

plaintiff filed a response to the motion (Doc. 48-1), a hearing was conducted

on the matter.  I advised the parties at the hearing that any materials that they

wished to have considered needed to be submitted in paper format, and that

any evidence not submitted in that form would not be considered.[5]  Thereafter,

both parties submitted in paper form some, but not all, of the materials that

had been filed electronically.  I have read all of the materials submitted in

paper form.

## II.

The court shall enter summary judgment only if the evidence

shows "that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  F.R.Civ.P. 56(c).

Material facts are those over which disputes "might affect the outcome of the

suit under the governing law."  <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S.

242, 248 (1986).  Disputes about material facts are genuine "if the evidence

is such that a reasonable jury could return a verdict for the [opposing] party."

---

[5]The defendants filed electronically, and without an index, seventy-eight attachments to their summary judgment memorandum, and most of those attachments were from twenty-five to thirty pages in length (Doc. 35).  It would be unduly burdensome to attempt to work with all those attachments in that format.

Id.  The movant bears the burden of establishing the absence of a dispute over material facts.  Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

When the party moving for summary judgment has the burden of proof at trial on a claim or contention, it must affirmatively show the absence of a genuine issue of material fact by presenting credible evidence that would entitle it to a directed verdict on that claim or contention if the evidence was not controverted at trial.  United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991).  If the moving party does not meet its burden, then the motion for summary judgment will be denied.  Id. at 1437-38. If the movant  meets its initial burden, then it is entitled to summary judgment unless the opposing party comes forward with "significant probative evidence demonstrating the existence of a triable issue of fact."  Id. at 1438.

When the party moving for summary judgment does not have the burden of proof at trial, that party may discharge its initial burden by identifying specific portions of the record which show the absence of evidence to prove the opposing party's case at trial, or, alternatively, it may come forward with "affirmative evidence demonstrating that the [opposing] party

will be unable to prove its case at trial." Id.  If this burden is not met, then the motion for summary judgment will be denied.  Id.

When the moving party meets its initial burden, the burden then shifts "to the [opposing] party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  If the party opposing the motion is unable to make a sufficient showing on an element essential to its case on which it has the burden of proof at trial, the movant is entitled to summary judgment. United States v. Four Parcels of Real Property, supra, 941 F.2d at 1438.

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party.  Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469.  Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment.  Id.

### III.

Count I of the second amended complaint is premised on the theory that Sally Jones was unarmed when she was fatally shot by Fernandez (Doc. 21, pp. 14-17, ¶¶ 59-72; Doc. 48-1, pp. 1, 5).  The plaintiff in his

pleading relies upon various statutory and constitutional provisions as a basis for relief (including an attorney's fee provision and a criminal statute) (Doc. 21, pp. 1-2, ¶¶ 1-3), but in his memorandum he appropriately settles on the Fourth Amendment and 42 U.S.C. 1983 (Doc. 48-1, p. 4).  Fernandez argues that, because Jones was armed, there was no constitutional violation, and that, furthermore, she is entitled to qualified immunity.

This case, therefore, turns on whether Jones held a gun. Importantly, the plaintiff makes no contention in the second amended complaint or in his memorandum that Fernandez's response to being confronted with a gun was unreasonable or improper.  In other words, the plaintiff does not assert any alternative contention that, even though Jones held a gun, Fernandez's actions subject her to liability.  Accordingly, if it is determined that Jones was holding a gun, the plaintiff's claim in count I fails.

On the other hand, if it is determined that Jones was unarmed, or that there is a genuine dispute of fact about that matter, Fernandez would not be entitled to summary judgment on count I.  The shooting of an unarmed woman under the circumstances presented here would plainly violate her Fourth Amendment rights.  Moreover, the law on that point was clearly established, so that Fernandez would not be entitled to qualified immunity.

The use of deadly force on a person constitutes a seizure of that person under the Fourth Amendment.  <u>Tennessee</u> v. <u>Garner</u>, 471 U.S. 1, 7 (1985).  Consequently, the shooting of an unarmed, and non-dangerous, person would constitute a violation of the Fourth Amendment.  <u>See</u> <u>id</u>.

Furthermore, the issue of qualified immunity depends upon whether the constitutional right the defendant violated was "clearly established" at the time [she] did it.  <u>Crosby</u> v. <u>Monroe County</u>, 394 F.3d 1328, 1332 (11th Cir. 2004).  At least by 1985, when the Supreme Court decided <u>Tennessee</u> v. <u>Garner</u>, <u>supra</u>, (if not long before), the law was clearly established that it was illegal for a police officer to fatally shoot an unarmed, and non-dangerous, person.  In short, this case hinges upon the facts, and not the law.  And, as explained, the dispositive fact is whether Jones was holding a gun.

On that issue, Fernandez testified unequivocally that Jones was holding a gun (<u>see</u>, <u>e.g.</u>, Fernandez dep., p. 87).  Moreover, she asked Jones what she was going to do with the gun (<u>id</u>. at p. 94).  Fernandez also testified that, at one point, her "eyes fixed on the gun itself and it began to raise" (<u>id</u>. at pp. 108-09).

There is no eyewitness testimony contradicting Fernandez's statements that Sally Jones was holding a gun.  Byron Jones was in the parking lot when the shots were fired.  Accordingly, his statements that, after reaching the door, he saw his wife fall and she had nothing in her hands, does not establish that she was unarmed prior to the shooting.  Byron Jones was plainly not in a position to see whether his wife was holding a gun at the time of the shooting.  Notably, Fernandez stated that, after the shooting, she located the gun that Sally Jones was holding in a recessed portion of the counter with the grip in the air (Fernandez statement, p. 17; <u>see</u> Plt. Ex. K; <u>see also</u> Fernandez dep., p. 138).  This location explains why Byron Jones did not see a gun on the floor.  Accordingly, there is no testimony from Byron Jones that creates a conflict with Fernandez's testimony that Sally Jones was holding a gun.

In an effort to create such a conflict, the plaintiff has presented evidence from Dennis L. McGuire, a crime scene expert.[6]  In his evidence,

---

[6]McGuire's evidence seems questionable because of an admitted bias in favor of the party who paid him (Plt. Ex. I, pp. 103-04).  He acknowledged that he did not include in his report facts that supported the defendants' position, saying "[i]f they are not supportive, why should I record them?" (<u>id</u>. at p. 104).  Nevertheless, I have made no credibility choice with respect to McGuire's evidence.  However, I have considered relevance, since much of what McGuire has to say has no meaningful bearing on whether Sally Jones was holding a gun.

McGuire mentions a number of obfuscating factors, but only two could have a bearing on whether Sally Jones was holding a gun: (1) the absence of fingerprints on the Joneses' gun, and (2) the failure to test for gunshot residue on Sally Jones's hands.

McGuire notes in an affidavit that the Florida Department of Law Enforcement ("FDLE") report of the shooting stated that the gun Sally Jones was said to have handled was clean of all fingerprints. He opines that "[i]t is improbable that Sally Jones handled the gun without leaving any prints whatsoever" (Plt. Ex. J, ¶9). However, he acknowledged in his deposition that people can touch things and not leave fingerprints, and that Sally Jones could have been touching the gun and left no fingerprints (Plt. Ex. I, pp. 47, 48).

Furthermore, Fernandez unquestionably handled the Joneses' gun after Sally Jones had handled it. However, Fernandez's fingerprints were not found on the gun either. In light of this circumstance, the absence of Sally Jones's fingerprints on the gun is not a meaningful factor in determining whether she had held the gun.

McGuire also seems to be suggesting that the claim that Sally Jones was unarmed is supported by the failure to show the absence of gunshot residue on her hands (Plt. Ex. I, p. 76). He acknowledges, however, that the

Joneses' gun was not fired and that Sally Jones could have held the gun without getting gunshot residue on her hands (id.).  In all events, McGuire notes in his report that no mention is made in the FDLE report that Sally Jones's hands were tested for gunshot residue (Plt. Ex. J, attachment).  In the absence of such a test, the matter of gunshot residue could play no part in determining whether Sally Jones held the Joneses' gun.

In sum, Fernandez testified that Sally Jones was holding a gun and there is no evidence to the contrary.  Moreover, in my view, the determinative factor is that the plaintiff's theory that Fernandez gunned down an unarmed woman is absurd.  Fernandez was a trained law enforcement officer who had never before fired a shot in the line of duty, or even pointed her gun at a suspect (Fernandez dep., p. 154).  She went to see Sally Jones in order to check on her welfare.  The time that she was in the jewelry store before the shooting was no more than four minutes, and Byron Jones estimates the time to be between two minutes and twenty-five seconds and two minutes and fifty-six seconds (Plt. Ex. C, ¶25).  It is ludicrous to think that, during this short period, Fernandez, who was simply performing a welfare check, would become homicidal or so enraged that she would gun down an unarmed woman.

Apparently recognizing, belatedly, that the claim that Sally Jones was unarmed was unsupported by any evidence and contrary to common sense, the plaintiff asserted at the hearing that Sally Jones was holding a Gatorade bottle and that Fernandez mistook that bottle for a gun. This claim, however, was not alleged in the second amended complaint (see Doc. 21), and no request was made for permission to amend the complaint to include it. Moreover, the claim was not argued in the plaintiff's memorandum in response to the motion for summary judgment (see Doc. 48-1). Consequently, the claim regarding the Gatorade bottle should not be considered. To permit the plaintiff to assert such an untimely claim would be unfair and prejudicial to the defendants since, if it had been properly raised, the defendants could have explored the issue in discovery and addressed it in their summary judgment motion. See Caribbean Ins. Services, Inc. v. American Bankers Life Assurance Co. of Fla., 754 F.2d 2, 6-8 (1st Cir. 1985).

In all events, the claim is patently meritless. No witness has stated that Sally Jones was holding a Gatorade bottle during the time Fernandez was in the store. In particular, while Byron Jones stated that he saw his wife with Gatorade earlier in the day, and that there was a Gatorade bottle found on the floor in the area where Sally Jones fell, he also said that

-19-

he did not see a Gatorade bottle in her hand as she was falling to the floor (Jones statement, p. 42).

Further, a person would not normally hold a Gatorade bottle down by her side, like a person might hold a gun by her side.  Moreover, a bottle of Gatorade looks nothing like a gun.  Importantly, as previously pointed out, Fernandez, before shooting, was within a few feet of Jones and her eyes were "fixed" on the gun.  Under these circumstances, it is implausible to conclude that Fernandez mistook a Gatorade bottle for a gun.  This is most likely the reason that the plaintiff did not allege such a claim in his complaint and did not argue it in his memorandum.

It is appropriate to add that the claim that a Gatorade bottle was mistaken for a gun requires acceptance of the plaintiff's additional theory that the Joneses' gun was planted near Jones by the deputies.  As explained shortly, however, that theory is unsupported by the evidence.

In sum, the plaintiff cannot sustain the claim of a Fourth Amendment violation under either theory he has advanced.  Thus, there is no evidence supporting the theory that Jones was unarmed, and Fernandez testified to the contrary.  Further, the theory that Fernandez gunned down an unarmed woman is inherently incredible.  Therefore, as the Eleventh Circuit

held in <u>Riley</u> v. <u>City of Montgomery, Alabama</u>, 104 F.3d 1247, 1251 (11th Cir. 1997), that theory could not support reasonable inferences sufficient to create an issue of fact.

In addition, the theory regarding the Gatorade bottle was not properly raised and should be rejected for that reason. In any event, the theory is unsupported by the evidence and meritless.

For these reasons, I recommend that Fernandez be granted summary judgment on count I.

IV.

In count II of his complaint, the plaintiff alleges that Fernandez and Arnew conspired together, and with unnamed deputies, to cover-up the shooting (Doc. 21, pp. 17-20, ¶¶ 73-79) in violation of Sally Jones's constitutional rights. Specifically, he asserts that the deputies conspired by, among other things, "removing Byron Jones' gun from the holster in the back room and planting it between the cash register and counter where it could be seen by other witnesses, and then have Erica Fernandez pretend to find it in the presence of witnesses," and thereafter giving false statements that Jones was armed (<u>id</u>. at pp. 18-19, ¶76).

Accepting that this claim is viable under the law, see Kingsland v. City of Miami, 382 F.3d 1220 (11th Cir. 2004), the claim fails on the facts. Thus, the conclusion that Sally Jones was holding the Joneses' gun negates the contention that the gun was planted.

While that determination is sufficient to defeat count II, it is appropriate to add that, even if there were a genuine dispute of fact concerning whether Sally Jones was armed, count II should be dismissed because there is no evidence of a conspiracy. The plaintiff alleges in the second amended complaint that, after the EMS personnel arrived, Fernandez and Arnew "disappeared into the back room where Byron Jones' workbench and gun were located and after some time of muffled conversing between them in the back room, Deputy Fernandez and Deputy Arnew emerged therefrom" (id. at p. 12, ¶51).   These circumstances fail to show that the gun was planted, since, prior to this time, EMS personnel had already seen the gun near the area of the shooting and out of the back room.   Thus, for example, Randall Wilds, a Pasco County fire fighter, stated that he saw deputies go into the back room after he saw Fernandez handling a gun (Wilds dep., p. 9).

Fernandez explained that, at Arnew's prompting, she went into the back room to clean the blood off her hands that resulted from

administering medical aid to Sally Jones (Fernandez dep., p. 137; Fernandez statement, p. 19). Also, Arnew said that he had Fernandez go into the back room because she "was visibly shaken and upset, so we brought her back there and sat her down" (Arnew dep., p. 20).

Consequently, Byron Jones's statements that he saw Fernandez and Arnew go into the back room and talk does not provide probative evidence of a conspiracy. Jones did not say, in particular, that he saw one of them coming out of the back room with a gun. Conclusory and unsubstantiated allegations of fabrication of evidence will not prevent the granting of summary judgment. Burgest v. Colquitt County, 2005 WL 3501852 *2 (11th Cir. 2005)(unpub. dec.).

Count II should therefore be dismissed.

## V.

The incident at the jewelry store was unquestionably a tragic event for everyone involved. The evidence and common sense indisputably establish that Fernandez did not shoot an unarmed woman. Since that was the theory upon which count I proceeded, that count should be dismissed. Similarly, the gun-planting conspiracy claim in count II is also meritless and

should be dismissed.  Therefore, I recommend that the defendants' Motion for Summary Judgment (Doc. 34) be granted.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: JANUARY 26, 2006

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).